This is an asylum case that's come before you from the IJ. The immigration judge made three findings on denying the respondent's application for asylum-related relief that we believe does not go to the heart of the claim that she made in respect to her well-founded fear of being persecuted. Her claim that she made was that she was part of a very small minority clan group in Somalia. This group is called the Madi Ban clan, and it is a very, very small group that has been discriminated against, not just discriminated against, I should say persecuted. You know, many, many violent atrocities have been committed against this small clan group, and it was detailed in the administrative records. She was asked what the reason was for the attack, and she said she didn't know. She said that. So the fact that she was part of a persecuted clan doesn't show that she, in fact, that was the reason that this was persecution. Many people who are persecuted sometimes are subject to other kinds of attacks. They can be subject to attacks by robbers, they can be subject to attacks by government officials trying to shake them down for, I mean, you know, we've seen many situations like that. And she specifically gets asked what was the reason, and she says she doesn't know, which is inconsistent with the claim that this was, she knew this to be an attack based on her past evidence. Yes, I understand. However, the objective evidence that had been presented to the immigration judge showing that she is, or that that clan group has been persecuted was fairly small. No doubt, I mean, if we accept that, it's fine that it's a persecuted group, but you have to actually show that this incident of persecution that she relies on, or this incident of violence that she relies on, which she gives some inconsistent descriptions as to what happened, that that, in fact, was part of persecution. I just have a hard time understanding how the IJ can be wrong when she herself says she didn't know. But it's my understanding also that someone who is similarly situated to other members of a group, in a social group, can too show that they would be persecuted. So she doesn't rely on that incident, on her own experience. She just relies on the mere fact that she is a member of that group. Is that your argument? I think it was an example of some of the harm that she suffered. But only if it is related to her protected status. If it's just random violence, which happens, then it doesn't help her claim any. And then she's relegated to relying on the fact that she's part of a group, she herself having suffered no persecution, and that's a much more difficult claim to make. Well, she had presented a witness herself, presented a witness who stated that, and identified herself as a member of that Klan group. There was no testimony, there was no questioning by the judge in respect to how, whether she qualified, whether she was a member of that group or not. I think the testimony that she did provide in respect to her... What about the inconsistent accounts she gave about the incident? I'm sorry? About her father and her brother, inconsistent accounts that she gave about the incident, the violent incident. What about those? Well, in reviewing the transcript again now, I can see there were inconsistencies. However, when you look at the totality of the circumstance at the time, what had happened is that these militia members come into her house. She identifies them as, from the United Somali Congress, I believe, another majority Klan group. They come into the house, they break the door down, they go in and start tying up her family. They rape her sister, they beat her up at the same time. She's a 15-year-old girl. Now, the way I see it... Do we have anything other than her account for what happened? No. So, since she's the only witness and her account establishes or doesn't establish it, then it seems to me that if she gives inconsistent accounts of what happened, a rational tie of fact can deduce from that that maybe she's making it up. That maybe it's not all true, that she's embellishing. Why aren't the inconsistencies, which you stood there and admitted, a sufficient basis for the IJA to say, look, there's no corroborating evidence, there's nothing but her word, and her word is inconsistent. She can't keep a straight story. If that's not enough for finding somebody not credible, I'm not sure what is. Well, Your Honor, I think the event itself is a very traumatic event for her. I think that the immigration judge was looking for a very straight, consecutive timeline as to what happened to her and her family. There were several people in her house at the same time. There was a lot of violence going on. There was guns. She was very young. She was actually hit. She stated she was beaten at the time. So I would pose this to the court that I don't know exactly how much she could remember in such a traumatic event. There was a recent case. But she has the burden. Petitioner has the burden. And she tells her story. And I realize there are reasons why, reasons for her inconsistency that she might give, that the IJA might believe. But the question is not what we believe or what would we have done if it had been the IJA. The question is, is it irrational for the IJA to look at the story and say, look, she can't keep a straight story. I don't, you know, I just don't believe her. Why is that something that a rational tire of fact can't do? Isn't it what juries do all the time? Well, of course, Your Honor. However, I believe that the political context, the objective evidence that was presented should be weighed in conjunction with her statement. And I believe that those were consistent. June of 1991, Somalia was suffering a civil war where large majority militias were going out and, you know, pillaging the countryside in order to take over the country. There were reports from the State Department showing and stating that those minority groups which the respondent, I mean the petitioner, I'm sorry, was a member of, was very vulnerable and they were, they suffered many atrocities. I think that's what the judge didn't do. He should have taken that political context in mind when looking at her statement. But many atrocities happen not on account of status. It's just, you know, it's a very bad place and lots of terrible things happen to people just because they happen to be in the wrong place at the wrong time. I don't mean to minimize it, but that's not a basis for asylum. Just being in a country that's subject to the strife of war or revolution or famine is not a basis for asylum. Asylum has to be based on persecution. True. I believe the Board of Immigration Appeals addressed that in a matter of age. I also believe this court implied in Jabril v. Gonzalez, which is 423 F. 3rd, 1129, 2005, where there was another minority caste clan member. It was an Abir clan member. I believe the Ninth Circuit implied that they too would be a protected class as a social group. But you can't just show that you're on a social group and come and get asylum. You have to show actual persecution, right? Well, the group has suffered persecution. You're taking the position that she may not have suffered any personal violence. Just being a member of a persecuted group is enough. Well, the fact that she's in that group and if she goes back to Somalia, even today, and if the same country conditions exist as they did back then, she should fear being persecuted for the same grounds of being in that social group. I wish you knew your record better. You're giving too much away. I have the same trouble Judge Kaczynski has with the variations in her story. The written version is different from the spoken version. The written version, they leave the house, they fire indiscriminately, killing the brother, not hitting the father. The spoken version is her brother becomes a hero and he's killed because he tries to protect the sister. And the father was shot in the written version. He's not shot in the second version. I've got the same difficulty that Judge Kaczynski has. I do not have any difficulty with respect to why this happened, if indeed it did happen. When she says, I don't know, the question she's answering is, well, why didn't they kill your whole family? And she says, I don't know. I don't understand the government to have argued that if the story is true, this is not past persecution. She did answer that question. She said that the fellows outside started shooting to indicate that the people inside who were raping her sister and beating the family and shooting her out, that they had to leave at that point and that they left and there were shots fired and the brother was killed. But I see nothing in the record that says, I don't know why they attacked us. They said, oh, I don't know why they came to our house. They just came in. That's right. But in her application. She does say that. If you start with her application, do you think her application alone would have stated sufficient facts to support her asylum application? Yes, I believe she identifies. So it's a difference between her testimony and the application that the immigration judge found to be indicative of non-credibility, correct? Okay. I was reading through the transcript, too. It seems to me, maybe this is your style, Mr. Peck. You were cross-examining your client rather aggressively, would you say? I can't recall. Well, I can. Well, I agree with Judge Fletcher. You're giving a lot too much away here. First of all, the incident occurred in 1991. She files the application in 1999, six years later. She goes from 15 to 21 years old. She testifies in 2003. That's 12 years after the incident in question. I mean, shouldn't you have explained to the immigration judge, Judge, she's a 15-year-old girl. She was traumatized. Things are not as consistent. Instead, what you do during the examination is you start to, I would say, badger your own client. You say, the story you're telling us today is different. Why the difference? This is a big difference. I might have to take a different position with you. It's like you lost patience with her. Was there a translator? Yes, there was. It was being translated. So were you having a problem with the translation? I mean, I don't understand why you would engage in that type of examination of your own client. I believe I was just trying to get her to, you know, try to be consistent with what she was saying. And it was unclear where she was going with some of the testimony. Well, what does it really matter whether her brother was killed? I mean, shouldn't you argue this to the IJ and to us, too? Does it really matter how her brother was killed? Her brother was killed. That's a fact. I agree. I believe it was the immigration judge took too much notice of that and not notice of the conditions. But is it a fact? I mean, it's a claim. And if she gives two different accounts of this claim, why can't the IJ say it's not a fact, it's a fabrication? You say he was killed, but you can't, you know, something like that is pretty traumatic, pretty significant, and to give different accounts of how it happened. I don't believe you. So it's not a fact. So what's irrational about that? Well, from what I remember, that the immigration judge put certain – he seemed to have put statements into the record for her where she just conceded his statement. I believe it was – You say just, but, you know, if she concedes, she concedes. She has a lawyer there. If the lawyer thinks that she shouldn't concede, the lawyer can interpose, object, you know, say something. But if the IJ is trying to clarify the record and he suggests something to her and she says yes, it's not just conceded. That sounds to me like she adopts a statement, she's conceded it. I mean, isn't that how a system works? Well, he was contrasting what was on the application and he misstated a little of what happened. She had testified that her brother was killed at the gate, and then the immigration judge says that the militia members were outside of the gate shooting back in, but it's not clear from the record that they were actually outside, and it's a little clearer as to actually where everyone was and what the layout of the home was, whether it was a courtyard, whether it wasn't a courtyard. It was a little bit unclear, and maybe because of the detailed and somewhat aggressive questioning of the immigration judge, who took over a lot of the questioning in the hearing, he took over much of the hearing, and I think maybe that was something that was not clear. Was that a claim you raised to the BIA that the IJ stepped out of his role as decision maker? It was not. It was not. So it's really not something you can raise here. I don't remember you raising it here either. Did the IJ find that she was totally making the story up from beginning to end? He didn't make a frivolous asylum determination, no, Your Honor. He found that this testimony and this evidence is incredible. It's on page 19 of his ruling, but it was unclear to me what exactly he was addressing as to which part of that statement he found incredible. Did you ever clear that up? I believe there was approximately five different instances that he cited in respect to what he believed was an inconsistent statement, and most of it revolved around, well, number one, how her parents were being supported in the refugee camp, how they went to Nairobi, who paid for the trip to Nairobi, and many of those travel in and out of the refugee camps, whether she could freely go or not go in and out of the refugee camps. Immigration judge asked her, could you freely go? She conceded yes, but then later she was asked once again, and she stated that she had to pay bribes to the security guards to go in and out. So the phrasing of being free was somewhat subjective, I think. She may have thought traveling in and out of the refugee camps freely was paying bribes, but she did later state that in the record at, I believe, 151, Your Honor. Oh, I'm sorry, 149. The immigration judge made it a point that the parents, how the parents, or why the parents did not travel to Nairobi at one point, and with the respondent, the respondent stated that her relative paid money and brought just her over. Then the immigration judge got confused with the issue of when they eventually left after the refugee camp was closed in 1996, and the respondent stated that she actually helped them come to Nairobi. Immigration judge saw that as an inconsistent statement from the testimony that her relative brought her from Nairobi. So he got confused in respect to the time period of when the money was sent from the relative. But all this happened years and years and years before, correct? Yes, Your Honor. Before she actually testified. Yes. This may be off to one side. You moved to submit this case on the briefs. Why? I'm not asking you to reveal any attorney-client privilege. I believe the case was, I believe she is eligible for asylum, and I think that was stated in the case, in the briefs, that she is a member of a class that should be protected, Your Honor. But you didn't think you needed to show up here to make that argument in person? Okay. It's the Court's decision one way or the other, Your Honor. I just put it out there. Okay. Okay, thank you. We'll hear from the Governor. Thank you, Your Honor. Thank you very much. Good morning, Your Honor. May it please the Court, my name is Jeffrey Bernstein, and I represent the Attorney General on this case. I'd first like to address the issue of a particular social group. I want to remind the Court that the petitioner did not make that argument before the Board, didn't talk about the particular social group. But she does in her asylum application. That's the heart of her asylum application. She says, I'm in a tiny minority that's being, basically, my word, ethnically cleansed by a dominant clan. And isn't it a fact? I mean, can't we take judicial notice of the fact that Somalia has been a lawless country since the early 1990s when this incident happened? Well, the record establishes that it's – that things are not stable in Somalia, to put it kindly. That's true. That's putting it very kindly, I would say. I'll take your point, Your Honor. But just because in one of her assertions she indicated that she thought that the individuals who invaded her home may have done so because she was Madaban, and in other sections of her statement she states that they came and they looted, doesn't establish that she's putting a particular social group argument in front of the immigration judge. Have you read the same transcript I've read? Yes, I have. You're not describing it the way I would describe it by a long shot. That is to say, the transcript is full of her describing the animosity between her tribe and these others and that they're really trying to wipe them out. She then asks why – well, if that's so, why didn't they kill your whole family? And she says, I don't know. She said many things, Your Honor, and certainly among those things that she said to the immigration judge was that she believes that they didn't like her clan. Now, the question is whether or not this particular attack occurred because they didn't like her clan. I don't believe that she said in any credible way that they – Well, wait a minute. You just injected in any credible way. That's a separate question. I don't think it is a separate question. No, to me it is a separate question. She may in the end not be credible, but I'm asking you for the moment, if what she said is credible, was there an attack based on her and on her family on a protective ground? As I read the transcript, there's not much question in my mind. As I've indicated, I have a fair question as to her credibility. That is to say, as I sit here right now, I'm inclined to affirm the IJ based on the adverse credibility. Well, I certainly don't want to dissuade you from that, Your Honor, but I have to say that I don't believe she raised the point before the immigration judge. She certainly didn't make that argument before the Board of Immigration Appeals. The Court doesn't have jurisdiction if it's not exhausted, but even if it was exhausted. Where in the AR do you have her presentation to the Board? Because I confess I did not read her presentation. It is in her Notice of Appeals on page 24 of the administrative record. But even if she did make the claim, even if she exhausted the claim, Your Honor, the evidence does not establish that. Let's not go on. Let's look at this. Page 23. Page 24, I believe, is her assertion in her Notice of Appeal. No brief was filed on her behalf before the Board. I see. So this is her entire presentation to the BIA. That's correct. The form that's at page 23 and 24. That's correct. Item number 6 is what she says. That's correct, Your Honor. But was merely a victim of civil strife. Why isn't that enough right there? Because it doesn't make an argument that she was a member of a group that is persecuted and was persecuted in Somalia. All she says is the immigration judge erred in a certain number of ways. That just doesn't make any sense to me with all due respect, Counsel. Her application, her testimony, and everything that she was trying to get across to the immigration judge was based on the fact that she was in this tiny minority clan and that in a governless country, the majority clans, particularly the Hawi clan, I think I'm pronouncing that right, was persecuting her. She even identifies the organization as the United Somali Congress that came to her house. It had the markings on the truck, which she confirms in her testimony, and that they attacked the family in an act that I consider ethnic cleansing. There is a U.N. report that was submitted. There were plenty of other U.N. reports and other reports about Somalia around that period of time. You might remember the Black Hawk Down incident was around that period of time or shortly after. The family was basically attacked. They were beaten. They were tied up. They were urinated on. Her brother was killed. Her sister was raped. She was terrorized. What else do you need? I mean, I don't understand why this judge found these minor, what I consider minor inconsistencies in her testimony to somehow make her incredible when it comes to those basic facts, which are not contradicted at all in her testimony as opposed to the application. She was 15 years old when this happened, and they fled the country, and they ended up in Kenya where they have no status at all as Somali refugees. I think she made that perfectly clear, too. Kenya does not welcome these Somali refugees. They have afforded tens of thousands of them refuge. If I may respond to your question. But you can see that if we were to reach that point on resettlement, that has to be remanded because of the new case. Well, we conceded in our brief, and I'm not going to back off on that concession, even though I think based upon the documents in the record and the decision in Maharaj, the immigration judge was perfectly correct because there is evidence that shows that evidence was not of direct evidence of formal offer of settlement. Why are you wasting time here if you say you're not going to back off on this concession? Would you just like to hear yourself talk? No, Your Honor. You're not going to back off on this concession, and then you're going to tell us why you're wrong in not backing off on this concession. But I think it's important for the court to know what the evidence is in the record and what the decision in Maharaj said. The BIA sustained the IJ on lack of credibility. That's correct. It seems to me if you want to win your case here, what you need to talk about is lack of credibility, because that's the one ground that if it's sustained, that will necessarily require us to deny the petition. I'm happy to do so, Your Honor. So that's really – May I make one point with respect to – I guess not as happy as I thought you would be, because you're going to talk about something else instead. I would just like to make one point with respect to Your Honor's assertions that there's clear evidence that her tribe was persecuted and is persecuted in Somalia. That's not the case. There are two mentions of her tribe in the State Department reports. They indicate that 10 or 12 minority groups, including her tribe, suffer sometimes grievous harm, but there's no indication that that grievous harm is perpetrated on account of their status as tribe members as opposed to the general lawlessness in the area. There is one document in the record which describes the minority – many minority groups in Somalia and their problems in Somalia. Her tribe is not mentioned, so I don't think the record is all clear that she was, even if – But there's nothing to contradict her consistent testimony in her application and before the judge that was being translated, so we obviously had some problems maybe in the translation, but her consistent testimony is we were a minority tribe, we were being pushed out of there by the – we tribe, and they are a dominant tribe in a lawless country. What else do you need? And her testimony wasn't credible, because the immigration judge noted a number of inconsistencies which went to the heart of her asylum claim. How did they go to the heart of the asylum claim? Her brother was killed, all right? How he was killed, is that really important? It is important. Why? Because this was a traumatic experience. She should be expected to remember. If she can't remember and there's reasons that she can't remember, then it is incumbent upon her to provide evidence of such. So she should go over there and take the depositions of these guys who – That's not what I'm saying, Your Honor. Well, but what else can she say? She's here alone, and she even said, you know, I don't remember everything. I forget some of the things that happened. She was 15 years old during this event. I don't understand what more you could ask for somebody like this. There was no evidence. There was no medical evidence that she suffered from post-traumatic stress syndrome. There was no evidence which explained the inconsistencies. In such an arena, the immigration judge had no choice but to take note of the inconsistencies which were central to her asylum claim. Now, wait a minute. Let's go off to the central. I mean, that to me is an important question because in the abstract, our law is very clear. In the detail, it's always hard to apply. If an inconsistency does not go to the heart of the claim, we disregard it. If it goes to the heart of the claim, we pay serious attention to it, and then the IJ says, on that basis, I find in credibility, okay, we go along with that. Except in real ID cases. This is not one of them. Yeah, yeah. Right. Can I speak? Yes, you're right. I apologize for that. What you said is irrelevant to this case? Okay. Well, to the extent that you look at… The answer is yes. This is not opposed to cases. The law I described is applicable to this case. Is that right? Real ID is not applicable. That's correct. Okay, thank you. She says, in both accounts, they shot and killed my brother. Between the two accounts, the manner in which they shot and killed the brother is different. In the first account, they're firing indiscriminately. In the second account, they killed him because she tried to protect the sister. Why is the core… Why does the manner in which he's killed go to the heart of the claim? Because that incident is the core of her claim. Well, the killing… Excuse me for a moment. The killing of her brother is clearly the core. I'm asking why the manner is part of the core. I think the whole attack is the core. And she should be expected to provide consistent testimony in describing the matter, the entire event, which is the core of her asylum claim. She did not, and she did not offer, when offered several opportunities to explain herself, she did not do so. Oh, yes, she did. She said, the person who filled out the application may not have understood everything I was saying. Remember, that was seven years after the event, and she still didn't speak English, and so it had to be translated from Somali to English and back to Somali for her to review. So how could you say that's not an explanation? To me, that's a very human explanation. And she says, maybe I didn't remember everything as clearly as you would like me to remember it, Judge. And then she says that in her testimony, too. That wasn't sufficient for the immigration judge. This Court cannot second-guess the immigration judge. Oh, I think we can hold the immigration judge to a standard of looking at what's really important in the core of the case and not. And I think here it seems to me that he went out of his way to deny this petition, basically cherry-picking minor inconsistencies that didn't go to the core of the case in order to deny the petition. There were a plethora of inconsistencies. I don't remember any inconsistency in this case that did not go to the core of the case. Why don't you give us a list of that? Why don't you give us that whole plethora, just so we have it? The immigration judge noted the inconsistency between, as we've been discussing, the indiscriminate firing, which resulted in the death, and her testimonial assertion that it was in reaction to her brother attempting to defend the sister. There was an inconsistency with respect to whether or not her father was shot. I believe in her statement she said the father was shot. In her testimony, her father was not shot. He was beaten instead of shot. That's correct, but it's still an inconsistency. So the written statement is the father is shot, and the testimony is that he's beaten. Is that right? That's my recollection, Your Honor. But certainly, if not, it's the other way around. Well, actually, let me read you the statement, because it's not so clear to me. And this statement, of course, is not perfect either in its grammar. As the gunmen were leaving our gate, they indiscriminately opened fire at us, killing my brother and wounding my father. She doesn't necessarily say that the wounding of her father was by gunfire. It was when they were leaving the gate. I don't think it's unreasonable for the immigration judge to have concluded something like that. I'm with you on that point, but I'm not necessarily with you on the point that it doesn't matter whether she said the father was shot in the statement or whether she said the father was shot in her oral testimony. The way we ordinarily deal with these, and the way the IJ ordinarily deals with this, is that the written statement isn't quite as strong, and then it gets a lot better at the time of the oral testimony. And then the IJ, for very good reason, is suspicious, because somebody took a look at the statement and said, you know, this isn't going to cut it. Your story had better get better. Well, with respect to her father, the story got worse. And I think that does matter, whether it gets better or gets worse, as you move from written statement to oral testimony. Even if it does, Your Honor, there are a plethora of other examples that the immigration judge gave. The statement indicates that there were barbed wire surrounding the camp because the Kenyan authorities didn't want the Somalis interacting with the rest of the populace. But all of a sudden, in oral testimony, she says she can come and she can go. And there's inconsistency with respect to those issues as well. Counsel had indicated that the immigration judge was confused. Well, he was rightly confused because of the testimony given by the petitioner. I was shocked when I read that transcript, and almost every page has examples of her either being inconsistent, her not answering questions that are directly asked of her, her continuing to not provide answers, even after the immigration judge warns her that he's going to make a negative inference if she continues not to do so. First you say the heart of the case is the violent incident that caused the family to flee to this refugee camp. And now you say that some of the inconsistencies had to do with whether there was barbed wire around the camp, or whether she could come and go. So, yes, she was free to come and go with a bribe. Well, that was a post hoc rationalization, Your Honor. Pardon me? That was a post hoc rationalization that she gave. It's clear in her testimony. And, yes, her... The testimony about Kenya goes to the firm Resettlement. Exactly, Your Honor. So it's not integral to her asylum claim. It is integral to her asylum claim, Your Honor. And excuse me for interrupting, but it is integral. But you did interrupt, and you can't seem to help yourself. I apologize, Your Honor. I just want to get it all out, and I apologize for that. You know, you really should get a transcript of your argument here, and go over it with your supervisor. Because it's really awful. Well, I apologize for that, Your Honor. You don't listen. You talk about things that are irrelevant. You interrupt. You really just do serious damage to Mr. Holder. Well, I apologize for that, Your Honor. I apologize to Mr. Holder, if you believe so, and I apologize to the court. But I don't do it intentionally. I do it because... Well, I think you do do it intentionally. I can assure you that I do not. If you can't control yourself better, you should probably go into medicine or some other line of work. Well, I've given a number of oral arguments in my career, Your Honor, and I don't think I've ever been accused of such conduct. I think most judges are too polite to do what you... But believe me, you're really not doing your client very much good at all. I sincerely apologize to the court. Mostly because you don't listen. You know, you just don't listen. You need to talk. You need to have your word in there. But anyway, I was going to say something to help you, but I think I'll just let it go. All right. I think you've exceeded your time. Thank you, Your Honor. Thank you. Cases are given ten minutes.
judges: Gettleman, Kozinski, Fletcher W.